```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                          EASTERN DIVISION

UNITED STATES OF AMERICA,        )
                                 )
        Plaintiff,                )
                                 )
   v.                            )       No. S1-4:04 CR 629 RWS
                                 )                            DDN
ANTOINE GORDON, et al.,          )
                                 )
        Defendants.               )
```

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the Court upon the pretrial motions of defendant Antoine Gordon to suppress evidence and statements (Docs. 291, 351). These motions were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636 (b). An evidentiary hearing was held on March 29, 2005.

Defendant Gordon's Waiver of Some Suppression Issues

At the evidentiary hearing, with the advice of counsel, defendant Antoine Gordon, orally and in writing, waived his right to go forward on any issues raised by his motions to suppress other than to contest the issuance of the wire tap orders and to seek the suppression of evidence derived from the wire taps. Therefore, defendant agreed to the denial of his motions as they involved evidence other than the evidence derived from the government's wire taps.

Wire Tap Issues

In his motion to suppress the evidence against him that was acquired through the use of wire taps, defendant Gordon argues that the court orders which authorized these interceptions were not supported by applications that included a "full and complete statement as to whether or not other investigatory steps ha[d] been taken, and why they ha[d] failed, or why such techniques reasonably appear[ed] to be unlikely to succeed if tried or [were] too dangerous to be tried," as required by 18 U.S.C. § 2518 (1)(c). Defendant also argues that the interceptions

were not made in conformity with the court orders which required minimization of communications not subject to the interception order.

An evidentiary hearing was held on March 29, 2005. At this hearing, government evidentiary document binders A and B, containing exhibits A1-A18 and B1-B23, were admitted into evidence.[1] From the evidence adduced at the hearing and the exhibits submitted, the undersigned makes the following findings of fact and conclusions of law:

**FACTS**

1. Since 1990, the federal Drug Enforcement Administration St. Louis Field Division, the St. Louis Metropolitan Police Department, and the St. Louis County Police Department have investigated heroin and cocaine trafficking by a criminal organization led by Adrian Minnis. In 2004 the government initiated proceedings for obtaining judicial authority to gather evidence by electronic surveillance of telephone communications (wire tap).

2. Anticipating the March 19, 2004, filing of an application for judicial authorization for the electronic monitoring, by letter dated March 18, 2004, the lead prosecutor in the investigation, Assistant United States Attorney Kenneth Tihen, instructed the monitoring agents with particularity how to implement the minimization requirements of the law and the anticipated order authorizing the wire tap. See Gov. Ex. A4. Also, Tihen met with the agents and personally advised them about minimization. Case Agent James McHugh read Tihen's letter, his own affidavit, and the application regarding the minimization requirement. McHugh also made sure each of the monitoring agents read the application for the wire tap, the order, his affidavit, and the minimization letter of Mr. Tihen. Before any agent began to monitor conversations, the agent was required to follow the minimization procedures and to sign the minimization letter. Monitors who were added to the investigation later were required to meet with AUSA Tihen about the minimization requirement. During their monitoring of the intercepted telephone

---

[1]The defense stipulated as to the accuracy of these exhibits.

conversations, the agents followed the minimization procedures and requirements.

3. On March 19, 2004, prosecutor Tihen filed an application for the interception of wire communications to and from a cellular telephone being used by Adrian Minnis, bearing telephone number 314-229-5949, referred to as target telephone #3. The application was assigned to District Judge Jean C. Hamilton. The application stated, in part, that normal investigative procedures had been tried and failed, reasonably appeared unlikely to succeed if tried, or were too dangerous to employ. See Gov. Ex. A1 at 4.

4. In his sworn affidavit, dated March 19, 2004, submitted in support of the application, Special Agent McHugh stated that the interception of wire communications was "the only investigative technique that ha[d] a reasonable likelihood of success in assisting to secure the evidence needed to prove beyond a reasonable doubt, that Adrian Minnis, the target subjects, and others not yet identified are acting as part of the Adrian Minnis Organization and are engaged in the distribution and sale of heroin, cocaine and marijuana, and the laundering of the monetary proceeds." See Gov. Ex. A2 at 35.

5. Agent McHugh's affidavit described how the following investigative techniques were used in investigating the Adrian Minnis Organization and had limited success, failed to expose the full scope of the organization, and could not fully identify additional sources of supply, customers, and sections of the organization functioning in the areas of St. Louis, Missouri; Los Angeles, California; and Chicago, Illinois:

### a. Grand Jury[2] and Administrative Subpoenas

Subpoenaing persons believed to be involved in the conspiracy and their associates to appear before a federal Grand Jury would have been unsuccessful because the individuals would most likely have been uncooperative and invoked their Fifth Amendment privilege not to testify. Seeking immunity for these individuals might have foreclosed prosecution

---

[2]Federal Grand Jury subpoenas for evidence were not issued before the government was authorized to engage in the wire tap monitoring.

of the most culpable members of the conspiracy and would not have ensured that such immunized witnesses would provide truthful testimony.

Additionally, Grand Jury subpoenas would alert other participants in the conspiracy to the investigation, causing them to become more cautious in their activities, to flee to avoid further investigation or prosecution, to threaten the lives of informants or witnesses, to destroy or conceal physical evidence, or to otherwise compromise the investigation.

Numerous administrative subpoenas have been used. They proved useful in identifying subscribers of specific telephones or in obtaining toll records of specific telephones. This information did not and would not likely identify the actual users of the telephones or reveal the criminal conversations. See id. at 39-40.

### b. Confidential Sources

Confidential sources were developed and used in the investigation. They were successful in making controlled purchases of narcotics on behalf of the investigative team. The evidence gathered from the drug purchases fell short of reaching the desired goals of the investigation, to uncover the nature and extent of the conspiracy. The confidential sources were not in a position to know the complete structure and methods of the Adrian Minnis Organization, to identify all sources of supply, or to know the true nature and full extent of the conspiracy. Because the organization consisted largely of family members and close, trusted associates, it was unlikely that a confidential source would ever be fully trusted.

Additionally, two confidential sources were in jail at the time the application was filed and were no longer in a position to provide current information or actively cooperate in the investigation. Another confidential source had refused to continue cooperating with the investigation. See id. at 40-41.

### c. Undercover Agents

An undercover agent was successful in making some controlled purchases of narcotics from individuals within the organization.

However, because the organization consisted largely of family members and close, trusted associates, the undercover agent was not able to fully infiltrate the organization. After an undercover agent made one controlled purchase of heroin from a member of the organization, that member told a confidential source that he was uncomfortable selling heroin to the undercover agent. It was unlikely that an undercover agent would ever be fully trusted.

Furthermore, the violent nature of the organization posed a threat to the safety of undercover agents. Several of the target subjects had extensive violent felony criminal records including weapons violations, assaults, manslaughter and murder.

Undercover agents were unable to fully identify the nature, extent and methods of operation of the heroin and cocaine distribution of the target subjects and others unknown; the identities and roles of accomplices, aiders, and abettors; the distribution and transfer of the contraband and money involved in these illicit activities; the existence and location of records pertaining to these activities; the location and source of resources used to finance their illicit activities; the location and disposition of the illicit currency derived from the sale of heroin and cocaine; and the location of items used in furtherance of those activities. See id. at 41.

Even though the wiretapping did not make the confidential sources and undercover agents more safe, these investigative techniques continued to be used in conjunction with the wiretapping of target telephone #3.

### d. Interviews of the Target Subjects or Associates

Interviews of target subjects would not produce sufficient information about the identities of all the persons involved in the conspiracy, the sources of supply for the heroin and cocaine, those financing the organization, the location of records and drugs, and other pertinent information regarding the crimes under investigation. Any response to the interview would likely contain a significant number of untruths, diverting the investigation with false leads or otherwise frustrating the investigation. This belief is based on past attempts to interview Adrian Minnis. He failed to cooperate with law enforcement and

would not provide truthful information or the evidence necessary to dismantle the organization. Such interviews would also have the effect of alerting members of the conspiracy, thereby compromising the investigation and resulting in the possible destruction or concealment of documents, contraband and other evidence and the possibility of harm to confidential sources whose identities may become known. See id. at 42.

### e. Search Warrants and Consensual Searches

Search warrants and consensual searches can provide valuable information and evidence for individual criminal violations, but normally do not provide evidence sufficient to determine the full scope of the criminal activity and the various methods being used by the co-conspirators. Previous searches of Adrian Minnis revealed currency believed to be used in purchasing drugs, and weapons, but did not render enough evidence to seek prosecution and did not assist in disclosing the full scope of the organization or the identity of the conspirators. Searches at locations relative to the investigation may have resulted in isolated seizures of heroin, cocaine, marijuana, and possibly some records related to part of the organization's transactions. However, even if the subjects did not destroy the records before successful entry to execute the warrant, seized records of drug transactions are often in code and difficult to interpret, and would not disclose the scope of the criminal conspiracy. Additionally, searches may alert members of the conspiracy about the investigation. See id. at 42-43.

### f. Physical Surveillance

Numerous physical surveillances were conducted of Adrian Minnis and other members of the organization since November 2003. This investigative technique provided some valuable information in identifying certain activities and associates of target subjects. However, such information was limited because the target subjects often became evasive and unusually cautious in their movements, thereby risking discovery of the surveillance officers.

On November 21, 2003, the investigative team established surveillance on the residence of organization member Dennis Spellman. Spellman was followed and observed stopping at one location to switch from driving one rented vehicle to another rented vehicle. While being followed, he drove in an erratic manner at varying speeds. Spellman could be observed looking out the rear window of the car in an attempt to identify surveillance units. Surveillance was terminated in fear of compromising the investigation. The surveillance was successful in demonstrating that members of the organization used several rental vehicles.

On November 6, 2004, the investigative team again established surveillance at the residence of Spellman and observed Adrian Minnis depart from this location driving a rented car. As the investigative team followed the vehicle it began erratically switching lanes and varying speeds. Eventually, the vehicle made an evasive turn, immediately pulled into a parking lot, and stopped. Surveillance was terminated for fear of compromising the investigation.

Physical surveillance had not sufficiently disclosed the criminal activity, the structure of the organization, the roles of the members of the organization, or identified additional conspirators, sources of supply, or controlling parties of the conspiracy. Continued surveillance was not expected to add to the information already available. See Gov. Ex. A2 at 43.

### g. Pen Registers and Telephone Toll Records

Pen registers and toll records were used throughout the investigation and were successful in disclosing the relationships among the members and associates of the organization and in pinpointing critical contacts between them. Analysis of this information would not alone show that these contacts are for a criminal purpose. A pen register cannot identify the source or sources of the drugs or monetary instruments nor can it establish proof of conspiracy.

Toll record information does not record the identity of the parties to the conversations, cannot identify the nature or the substance of conversations, or differentiate between legitimate calls and calls for

criminal purposes. The pen register and toll record information was helpful, but failed to provide sufficient information to prosecute persons involved in this investigation. See id. at 47.

> **h. Mobile Tracking Devices**

Mobile tracking records showed that the Adrian Minnis Organization used several vehicles, including rented vehicles, on a regular basis. Therefore, it was impossible to pick one specific vehicle in which to install a mobile tracking device. Even if such a device could have been installed, it would not have provided information about the structure of the organization, the identities of all the members, their specific roles, and other details regarding the methods of operation for the organization. See id.

> **I. Police Records**

Police records were useful but revealed only past information concerning police contacts with subjects and revealed little of their present activities. See id. at 48.

    6. Adrian Minnis and other target subjects used cellular telephones, including pre-paid cellular telephones, to conduct criminal drug activity. The phones were subscribed in other names and were frequently "dumped" or exchanged for new devices, to thwart law enforcement's ability to intercept their communications.

    7. The target subjects had become aware of many of law enforcement's investigative techniques, specifically surveillance, pen registers, telephone records, search warrants, and the introduction of confidential sources and undercover agents. See Gov. Ex. A2 at 37.

    8. By order dated March 19, 2004, District Judge Jean C. Hamilton, in Cause No. 4:04MC00101, authorized the installation of the electronic device to intercept wire communications to and from target telephone #3. The order included a minimization requirement.[3] See Gov.

---

[3] Minimization was understood by Agent McHugh as the process whereby wire tap monitors do not listen to certain privileged conversations, including those conversations held with a member of the clergy, spouse, or attorney, and conversations not pertinent to the criminal
(continued...)

Ex. A3. The agents began monitoring intercepted wire communications over target telephone #3 on March 19, 2004.

    9. On April 20, 2004, the government applied for and the court issued an order extending the operation of the wiretapping device. Court ordered surveillance of this cellular phone ended on May 11, 2004.

    10. After receiving authorization for the first wiretapping of Adrian Minnis, no controlled purchases of narcotics were made by undercover agents. The government continued its attempts to develop information through confidential sources but was unsuccessful.

    11. On April 12, 2004, monitoring agents intercepted two conversations between Adrian Minnis and an attorney. On April 20, 2004, District Judge Hamilton was advised of these interceptions by a Notification of Attorney Interception document, Government Exhibit A13. The government disclosed the conversation to Judge Hamilton and advised her it believed the conversation between Minnis and the attorney may have involved the commission of a crime and, therefore, the monitored conversations were not subject to minimization as privileged or non-pertinent communications. After receiving this record of the intercepted conversations, Judge Hamilton did not issue an order prohibiting any further interception of conversations between Adrian Minnis and the subject attorney. No other such conversation with an attorney was intercepted.

    12. On May 4, 2004, prosecutor Tihen filed an application to intercept wire communications to and from two different cellular phones being used by Adrian Minnis, 314-229-8231, described as target telephone #4, and 314-581-1370, described as target telephone # 5. Agent McHugh filed a supporting affidavit. <u>See</u> Gov. Ex. B1 at 2.

    13. In his supporting affidavit, filed May 4, 2004, McHugh stated that many facts had been learned through the interception of previous wire communications, but much was still unknown and "need[ed] to be clarified in an attempt to expose the complete scope of the Adrian Minnis Organization." In particular, the investigative team had been unable to determine distribution patterns, safe house locations, and the complete

---

    [3](...continued)
investigation.

identities of many of the distributors and facilitators in St. Louis, Missouri.  See Gov. Ex. B2 at 41.

14.  McHugh re-stated that the individuals involved in the drug trafficking and money laundering being investigated used a variety of methods to thwart law enforcement's ability to intercept their communications, including consistently changing cellular phones, and using phones issued in other names.  Minnis had ceased using target telephone #3.  Agent McHugh also re-stated the failure of all other investigative techniques to reveal the full scope of the organization.

15.  By order dated May 4, 2004, Judge Hamilton authorized the installation of the electronic devices to intercept wire communications to and from target telephones #4 and #5 being used by Adrian Minnis.  The order included a minimization requirement.  See Gov. Ex. B3.

16.  On June 2, 2004, the government applied for and the court issued an order extending the operation of the wiretapping device on both cellular phones.  See Gov. Ex. B9.  On July 2, 2004, the government applied for and the court issued another order extending the operation of the wiretapping device on only target telephone #4.  See Gov. Ex. B17.

## **DISCUSSION**

A federal judge may issue an order authorizing or approving the interception of wire or oral communications, upon the proper application of the United States.  18 U.S.C. § 2516(1).  The judge may issue the order, if the judge determines, along with other factors, that normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.  18 U.S.C. § 2518(3)(a)-(d); United States v. Milton, 153 F.3d 891, 895 (8th Cir. 1998).  Defendant argues that the basis for the court's findings on this factor are insufficient.  The undersigned disagrees.

The affidavit submitted to Judge Hamilton stated that the government had used confidential sources, subpoenas, an undercover agent, physical surveillance, pen registers, telephone toll records, mobile tracking devices, and police records.  The affidavit clearly established that the normal investigative procedures did not and would not reasonably disclose the entire breadth of the criminal enterprise under

-10-

investigation.  There was no error in issuing the electronic surveillance orders under these circumstances.  <u>United States v. Barnes</u>, 47 F.3d 963, 965 (8th Cir. 1995); <u>United States v. Daly</u>, 535 F.2d 434, 438 (8th Cir. 1976).

Defendant Gordon argues that the monitoring agents did not sufficiently minimize their interception of privileged conversations is without merit.  The relevant statute provides, "Every order and extension thereof shall contain a provision that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter . . . ."  18 U.S.C. § 2518(5).  The effort to minimize must be examined to determine whether the monitoring agent or agents acted in an objectively reasonable manner in light of the factual circumstances.  <u>Scott v. United States</u>, 436 U.S. 128, 136-37, 141-43 (1978).

Clearly, in this case the procedures put into place by the government were sufficient to minimize the monitoring of privileged or non-pertinent communications.  A review of the record, including the notice provided to Judge Hamilton, establishes a substantial basis for believing that the monitored communications between Adrian Minnis and the attorney possibly involved the commission of a crime.  Thus, the conversation was properly not minimized, but was reported to the supervising judge.

For these reasons,

**IT IS HEREBY RECOMMENDED** that the motions of defendant Antoine Gordon to suppress evidence and statements (Docs. 291, 351) be denied.

The parties are advised they have ten (10) days to file written objections to this Report and Recommendation.  The failure to file objections may result in a waiver of the right to appeal issues of fact.

**DAVID D. NOCE**
**UNITED STATES MAGISTRATE JUDGE**

Signed on July 1, 2005.